U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*Harlin DeWayne Hale*

**Signed October 5, 2006**                                        **United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GADZOOKS, INC., | § | Case No. 04-31486-HDH-11 |
| | § | |
| Debtor. | § | |

### MEMORANDUM OPINION ON
### FINAL FEE APPLICATION OF HUGHES & LUCE, LLP

This opinion addresses the question of whether professionals for an equity security holders'

committee, hired pursuant to 11 U.S.C. § 327, must show an "identifiable, tangible, and material

benefit" to the bankruptcy estate, in order to be compensated under 11 U.S.C. § 330(a), regardless

of the reasonableness of such services at the time that they were rendered.

The present matter before the Court is the Final Application of Hughes and Luce, LLP

("H&L"), Counsel to the Official Committee of Equity Security Holders, For Allowance of

Compensation (the "Fee Application"). William Kaye, the Liquidating Trustee, joined with a prior

objection of the Official Committee of Unsecured Creditors to the Fee Application. The Unsecured

Creditors' Committee dissolved upon confirmation of the Plan in this case, so the Liquidating

Trustee appeared to argue the objection at the hearing. In the objection, the Liquidating Trustee neither objects to any of the individual time entries nor to the rates charged by H&L, but rather questions whether H&L should receive any compensation, relying on the Fifth Circuit's decision in *Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir. 1998). The Liquidating Trustee asserts that because the equity security holders in this case will receive no distribution, and the rights offering, disclosure statement and plan drafted by H&L were withdrawn, that H&L provided no "identifiable, tangible, and material benefit"to the bankruptcy estate.

### *Jurisdiction*

This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This proceeding is core, pursuant to 28 U.S.C. § 157(b)(2)(A), (B) & (O).

### I.     FACTUAL BACKGROUND

The following facts were largely stipulated to by the parties involved in this fee dispute. On February 3, 2004 (the "Petition Date"), Gadzooks, Inc. (the "Debtor" or "Gadzooks") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Gadzooks was incorporated in Texas in 1982 as a mall-based speciality retailer of casual apparel and related accessories for young men and women. Throughout the 1980's, 90's and early 2000's Gadzooks enjoyed steady success and growth, with a store count rising from 90 in 1995 to 439 stores in 41 states in the Fall of 2003, with annual revenues for 2003 of $325 million.

In October 1995, Gadzooks went public, with its equity being publically traded on the NASDAQ exchange. In addition to Gadzooks stores, in the Fall of 2001 the Debtor began testing a new retail concept with the opening of four Orchid stores in two states. The Orchid stores catered to the innerwear and sleepwear needs of females between the ages of 14 and 22.

On January 9, 2003, Gadzooks announced plans to focus exclusively on apparel and accessories for females principally between the ages of 16 and 22. The conversion of the stores to an all-female merchandise assortment took place during the second half of 2003. In January 2004, Gadzooks decided to discontinue testing the Orchid concept and liquidated the Orchid stores during the first quarter of 2004. Prior to the Petition Date, Gadzooks suffered negative sales trends stemming from the completion of its conversion to an all-girl merchandising assortment, and had been conducting store closing sales, going out of business sales, and inventory liquidations. During the first half of 2004, Gadzooks closed 167 stores, including the four Orchid Stores.

In excess of nine million shares of common stock were issued and outstanding on the Petition Date. The Debtor's stock sold for $0.89 per share at the close of trading on the Petition Date. The Debtor's market capitalization on the Petition Date was $8,164,860.00. On June 3, 2004, the United States Trustee appointed the Official Committee of Equity Security Holders (the "Equity Committee"). On June 3, 2004, 9.174 million shares of common stock were issued and outstanding. The Debtor's stock sold for $1.90 per share at the close of trading on June 3, 2004. The Debtor's market capitalization on June 3, 2004 was $17,430,630.00. During 2004, there was an active market in the Debtor's securities.

On June 10, 2004, the Equity Committee filed an application seeking to retain H&L as its counsel, as of June 8, 2004. On June 15, 2004, the Court entered an order authorizing the

employment of H&L on an interim basis, effective as of June 8, 2004 (the "Interim Retention Order"). The Interim Retention Order also amended the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Compensation Procedure Order") to allow H&L to use the previously approved interim compensation procedures for estate professionals.

At the time the Equity Committee was formed, the Debtor had a Debtor in Possession ("DIP") credit facility with Wells Fargo Retail Finance, LLC. All of the Debtor's assets were encumbered as security for the DIP credit facility.

The Official Committee of Unsecured Creditors (the "Creditors Committee") initially objected to the employment of H&L as counsel for the Equity Committee. The Equity Committee and the Creditors Committee subsequently entered into a series of stipulations continuing the final hearing on the employment of H&L as counsel to the Equity Committee and containing other terms and conditions. (H&L Exhibits 4 and 7). In each of the stipulations, the Creditors Committee reserved the right to

> object to: (a) the continued retention of H&L by the Equity Committee after the Continued Hearing Date; (b) the payment to H&L of fees and expenses incurred after the Continued Hearing Date; or (c) the reasonableness of H&L's fees and expenses incurred either before or after the Continued Hearing Date; provided, however, subject to any objections as to reasonableness, the Creditors' Committee shall not object to, seek to disallow, seek to impose any cap or limit on, or seek the disgorgement of any fees and expenses for the period up to and including the Continued Hearing Date.

The fourth such stipulation defined the Continued Hearing Date as October 27, 2004. (H&L Exhibit 7).

The Equity Committee incurred attorneys fees through October 27, 2004, in the amount of $694,753.00 and expenses through October 27, 2004, in the amount of $9,645.58, for which it seeks payment and final allowance of in the total amount of $704,398.58.

The Equity Committee incurred attorneys fees subsequent to October 27, 2004 in the amount of $242,588.00 and expenses subsequent to October 27, 2004, in the amount of $3,722.04, for which it seeks payment and final allowance of in the total amount of $246,310.04.

The Creditors Committee subsequently withdrew its objection to the retention of H&L as counsel to the Equity Committee. On November 2, 2004, the Court entered an order authorizing the retention of H&L on a final basis, effective as of June 8, 2004 (the "Final Retention Order") (H&L Exhibit 10). The Final Retention Order authorized H&L to utilize the procedures in the Compensation Procedures Order for payment of interim fees and expenses.

On June 9, 2004, six days after the Equity Committee was formed, the Equity Committee requested a meeting with the Debtor's management. On June 14, 2004, representatives of the Equity Committee, including the chairman, Ryan Vardeman, and attorneys from H&L met with the Debtor's CEO, Gerry Szcepanski, Debtor's counsel, the Debtor's and the Debtor's financial advisor at the Debtor's headquarters. This meeting was followed by another meeting on June 29, 2004 at which the Debtor's investment banker and all of the members of the Equity Committee either attended or participated in by teleconference.

As a result of these meetings, there was a consensus that the Debtor faced a choice between two options: (1) sell the Debtor's assets, likely at a considerable loss, or (2) attempt to recapitalize the company through a rights offering to existing shareholders. The Debtor supported a

recapitalization through a rights offering, but insisted that the offering be guaranteed through a process known as a "backstop."

On July 16, 2004, the Equity Committee, after discussions with various institutional shareholders regarding the likely success of a rights offering and the ability to obtain the necessary guarantees, sent its first proposed letter of intent to the Debtor, stating that it would support a recapitalization of the Debtor through a rights offering. (H&L Exhibit 1). The essential terms of the offer were that the Debtor would be recapitalized through a guaranteed rights offering that would raise $20 million. The proceeds would be used to pay off the Debtor's secured debt, pay administrative expenses, and fund a cash recovery of 50% to allowed unsecured claims. The balance of allowed unsecured claims would receive stock in the reorganized Debtor. This first letter of intent contained a provision prohibiting the Debtor from pursuing other reorganization alternatives, such as an asset sale. (H&L Exhibit 1). The Debtor did not sign the letter of intent.

The Equity Committee continued to negotiate with the Debtor and the Creditors Committee through a series of phone calls and meetings following the July 16, 2004, letter of intent. A revised version of the letter of intent was sent to the Debtor on August 4, 2004.

The Creditors Committee provided comments to the August 4, 2004 letter of intent. The Creditors Committee requested, among other things, that the Debtor continue to search for a buyer for its assets.

The Equity Committee sent a second revised letter of intent to the Debtor on August 16, 2004 (the "Letter of Intent"). (H&L Exhibit 2). The Letter of Intent was more favorable to the Debtor and unsecured creditors in a number of areas. The guaranteed rights offering was raised to $25 million. Allowed unsecured claims would be paid 75% of their allowed claims in cash or, at their election,

25% in cash and 75% in stock in the reorganized Debtor. The restriction on pursuing other reorganization alternatives was deleted, allowing the Debtor to pursue an asset sale or other alternatives. (H&L Exhibit 2).

The Debtor signed the Letter of Intent on August 16, 2004. (H&L Exhibit 2).

On August 17, 2004, the Debtor's CEO sent a letter to the chairman of the Creditors Committee, urging him to sign the Letter of Intent. (H&L Exhibit 2). That same day, the Creditors Committee responded to the letter from the Debtor's CEO. (H&L Exhibit 3). The Creditors Committee stated that it would not sign the Letter of Intent, but would support a plan of reorganization along the lines outlined in the Letter of Intent and the Creditors Committee's response. In transmitting the Creditors Committee's response, counsel for the Creditors Committee indicated that the response represented a balanced approach and "provides a basis for the Company, the EC and the Funding Guarantors to proceed to prepare definitive documents, including making provision of the payment of Hughes & Luce's fees during this period." (H&L Exhibit 3).

Negotiations between the Debtor, the Equity Committee, and the Creditors Committee continued throughout September and October 2004. Also during this period, the Equity Committee contacted and discussed the rights offering with numerous institutional shareholders. The Equity Committee also assembled a group of investors (the "Funding Guarantors") to provide the $25 million backstop for the rights offering.

On October 14, 2004, the Debtor and the Funding Guarantors executed the Investment Agreement. (H&L Exhibit 5). The Investment Agreement provided for the timing for filing and confirming a plan of reorganization. One of these requirements was that the Debtor file a registration

statement with Securities and Exchange Commission, known as an "S-1", for the securities that would be issued in connection with the rights offering. (H&L Exhibit 5).

The deadline specified in the Investment Agreement for filing the S-1 was December 15, 2004. This deadline was chosen after negotiations among the Debtor, the Equity Committee and the Creditors Committee. The December 15, 2004 deadline was driven by a number of factors. The Debtor estimated that its liquidity needs required the rights offering to be closed by March 2005. This was also the latest point at which the Creditors Committee was willing to extend the closing of the rights offering. Given the statutorily mandated 20-day business period that the rights offering had to remain open to shareholders, the amount of time for the SEC to review the S-1 (estimated to be 45 days), and the fact that the Debtor's financials would have been out of date before the rights offering could be closed, December 15, 2004 was essentially the latest possible date that all parties could agree the S-1 should be filed.

The Investment Agreement provided for the issuance of warrants to the Funding Guarantors as consideration for the backstop. (H&L Exhibit 5).

The Investment Agreement also provided for a $600,000 termination fee and up to $300,000 in expense reimbursements in the event the Debtor elected to pursue another transaction in lieu of the rights offering. (H&L Exhibit 5).

On or around October 20, 2004, the Debtor filed a motion to approve the fees required by the Investment Agreement. (H&L Exhibit 6). In support of this motion, the Debtor stated that "the Investment Agreement is the cornerstone for financing a successful reorganization . . . [without which it] will not be able to emerge from bankruptcy in the immediate future." (H&L Exhibit 6 at

5).  No objections were filed to the motion.  The Court entered an order granting the motion and approving payment of the fees on November 29, 2004 (H&L Exhibit 14).

On October 25, 2004, the Creditors Committee sent an email to counsel for the Equity Committee proposing a settlement whereby the Creditors Committee would support the rights offering reflected in the Letter of Intent and the Investment Agreement.  (H&L Exhibit 8).  In this email, the Creditors Committee proposed that the amount paid on unsecured claims (through a creditors trust) would be between $12.5 million and $15 million, subject to a working capital adjustment formula.  If the amount raised and awarded to the unsecured creditors (after satisfying secured debt, administrative expenses and retained working capital) was less than $12.5 million or was not paid by April 30, 2005, the Creditors Committee could elect to accept less than $12.5 million or could terminate the rights offering and cause a responsible person to be appointed to sell the Debtor's assets.  (H&L Exhibit 8).

Around this time – October 2004 – it became apparent that the Debtor was facing a liquidity crises.  The Debtor's existing DIP lender, Wells Fargo Retail Finance, LLC, indicated that it would not extend any further credit to the Debtor.  The Debtor requested that one or more of the members of the Equity Committee provide a $5,000,000 tranche B DIP loan to the Debtor.  Gryphon Master Fund, L.P., an affiliate of one of the members of the Equity Committee, agreed to make a $5,000,000 tranche B DIP loan.  (H&L Exhibit 9).  The loan was junior in priority to the DIP facility provided by Wells Fargo Retail Finance, LLC.  Other members of the Equity Committee participated in the loan.  At the fee application hearing, the parties stipulated that, if called to testify, Ryan Vardeman, an authorized representative of Gryphon Master Fund, L.P. would testify that Gryphon Master Fund, L.P. and the participants would not have made this loan to the Debtor if it had not believed that the

rights offering reflected in the Letter of Intent and the Investment Agreement was not feasible and beneficial to the Debtor. The Creditors Committee supported this extension of credit with certain modifications.

The Debtor and the Equity Committee continued to work on a plan of reorganization and disclosure statement containing the terms reflected in the Letter of Intent and the Investment Agreement. On or about November 6, 2004, the Debtor filed its Disclosure Statement for Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (H&L Exhibit 12).

Negotiations between the Debtor, the Equity Committee and the Creditors Committee continued. The negotiations culminated in an agreement dated November 10, 2004, between the parties contained in the Agreement of Terms (H&L Exhibit 13). The Agreement of Terms provided for a complex working capital adjustment and a targeted distribution to unsecured creditors in the amount of $12.5 million and adjustments, based on certain formula, that would cause the distribution to range between $11 million and $15 million. As required by the Creditors Committee, if the recovery to unsecured creditors was less than $11 million, the Creditors Committee could (a) elect to accept a lesser amount or (b) or could terminate the rights offering and cause a responsible person to be appointed to sell the Debtor's assets, with the rights offering proceeds returned to the shareholders and Funding Guarantors. In the Agreement of Terms, the Creditors Committee agreed to support the Debtor's plan, as amended to conform to the Agreement of Terms. (H&L Exhibit 13).

The Debtor's sales figures for the 2004 holiday season were well below projections. The Equity Committee first became aware of the Debtor's poor sales performance (for the month of November 2004) in December 2004.

On December 13, 2004, the Creditors Committee filed an objection to the Debtor's disclosure statement. (H&L Exhibit 15). In the objection, the Creditors Committee asserted that, on December 10, the Debtor had provided revised financial projections that led the Creditors Committee to conclude that the amount available for unsecured creditors would be between $5 million and $8 million. The Creditors Committee stated that it would not accept a distribution in this range, and there was little chance the plan could be confirmed. (H&L Exhibit 15 at 3).

By December 14, 2004, it had become clear that the Debtor would not be able to file its S-1 registration statement by the required deadline. The Debtor's counsel informed counsel for the Equity Committee that the Debtor's auditors, PricewaterhouseCoopers LLP ("PwC"), were reluctant to allow the Debtor to use its audits in connection with the S-1. PwC.'s consent to the use of the audits was required for filing the S-1. On December 14, 2004, counsel for the Equity Committee wrote to counsel for the Debtor noting the defaults under the Investment Agreement, including the failure to file the S-1 statement and the fact that the Debtor would have to restate its financials. (H&L Exhibit 16).

The Debtor notified the Equity Committee and the Funding Guarantors of its default on December 16, 2004 (H&L Exhibit 17)

On December 30, 2004, the Debtor's senior DIP lender, Wells Fargo Retail Finance, LLC, notified the Debtor that it was in default under its loan agreements by failing to achieve the minimum cumulative sales receipts. (H&L Exhibit 18).

On January 4, 2005, the Debtor sent a letter to the Equity Committee asking permission to seek other "Strategic Transactions," including the solicitation of bids for the sale of the Debtor's assets. (H&L Exhibit 19). The Equity Committee responded on January 6, 2005, by requesting

certain information from the Debtor and giving notice of default under the Investment Agreement. (H&L Exhibit 20).

On January 11, 2005, the Creditors Committee delivered a letter dated January 7, 2005 to the Equity Committee stating that, in light of the Debtor's defaults on its DIP loan and its failure to file the S-1 registration statement, there was no value for equity holders. (H&L Exhibit 21). The Creditors Committee requested that H&L stop incurring fees and expenses and requested that the Equity Committee dissolve.

That same day, on January 11, 2005, the Debtor and the Equity Committee agreed to voluntarily terminate the Investment Agreement. (H&L Exhibit 22). The Equity Committee was dissolved on or about January 11, 2005.

On January 12, 2005, the United States Trustee filed with the Court a Notice of Dissolution of Official Committee of Equity Security Holders. Soon thereafter, on January 24, 2005, the Court entered its Order under 11 U.S.C. § 1103 Terminating Representation of Hughes & Luce, LLP, Former Counsel to Now Dissolved Official Committee of Equity Security Holders (H&L Exhibit 23).

The Debtor did not proceed with the plan of reorganization containing the rights offering reflected in the Letter of Intent, the Investment Agreement, and the Agreement of Terms.

On February 6, 2006, the Bankruptcy Court entered Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Chapter 11 Plan of Liquidation Proposed by the Debtor and the Official Committee of Unsecured Creditors (Dated October 31, 2005), as Modified, thereby confirming a Chapter 11 Plan of Liquidation. The Chapter 11 Plan of Liquidation did not include the rights offering advanced by the Equity Committee.

## II.    ISSUE

Does the Fifth Circuit's decision in *Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414 (5th Cir.1998) ("*Pro-Snax")*, preclude the award of fees to Hughes & Luce, counsel for the Equity Committee?

## III.  ANALYSIS

### A.  How Are Professional Fees Awarded under the Bankruptcy Code?

### *Some Background History–or the State of Things Prior to 1994*

Prior to the Bankruptcy Act of 1978, fees were awarded to professionals in a bankruptcy case on a "reasonableness" standard.  In addition to a finding of reasonableness, the bankruptcy court had to find that the services rendered were necessary.  *In re First Colonial Corp. of America*, 544 F.2d 1291, 1298 (5th Cir.), cert. denied,  431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).  In an effort to "establish an objective basis for determining the amount of compensation that is reasonable for an attorney's services," the Fifth Circuit required bankruptcy courts to consider the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974).  *Id*.  These twelve factors are: (1) time and labor required; (2) the novelty and difficulty of the issues involved; (3) skill required to perform the legal services properly; (4) the preclusion of other employment of the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the case; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards given in similar cases.  *See Johnson*, 488 F.2d at 717-18 ("*Johnson* factors").

After the *First Colonial* decision, in the Bankruptcy Act of 1978, Congress enacted § 330(a), which governs the compensation of professionals working on a bankruptcy case, and provided courts

with some guidelines as to how "reasonable compensation" should be determined. *See* 11 U.S.C. § 330(a)(1). Section 330(a) provided that:

> After notice to any parties in interest and to the United States trustee and a hearing, . . . the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney–
> (1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney. . .and by any paraprofessional persons employed by such trustee, professional person, or attorney as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and
> (2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a). In essence, § 330(a)(1) required a court to engage in a two-step analysis, by first ascertaining the nature and extent of the necessary and appropriate services rendered by the professional, and then assessing the reasonable value of those services. The resulting product, called the "lodestar," was then presumed to be a reasonable fee. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S.Ct. 3088, 3097-98, 92 L.Ed.2d 439 (1986); *Graves v. Barnes*, 700 F.2d 220, 222 (5th Cir. 1983) (adopting "lodestar" method of calculation, citing *Copper Liquor Co. v. Adolph Coors Co.*, 684 F.2d 1087, 1092-93 (5th Cir. 1982)). In the Fifth Circuit, this two-step analysis did not end the inquiry, a third-step of adjusting the resulting lodestar up or down based on the *Johnson* factors was required. *See Shipes v. Trinity Industries,* 987 F.2d 311, 319-20 (5th Cir.), *cert. denied,* 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993); *see also Copper Liquor*, 684 F.2d at 1093; *In re Lawler,* 807 F.2d 1207 (5th Cir.1987). The Supreme Court had stated much the same: "[t]he product of the reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of 'results obtained.' " *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Also, the Fifth Circuit has repeatedly stated

that "[t]he lodestar may be adjusted according to a *Johnson* factor only if that factor is not already taken into account by the lodestar." *Transamerican Natural Gas Corp. v. Zapata P'ship, Ltd. (In re Fender),* 12 F.3d 480, 487 (5th Cir.1994) (citing *Shipes*, at 319-20).

Thus, in the Fifth Circuit, these "other considerations" alluded to in *Hensley v. Eckerhart* were the *Johnson* factors not already considered by the court in determining the "lodestar," particularly, the novelty and difficulty of the issues involved, special skill required to perform the legal services, the quality of the representation, and the results obtained. *See Shipes*, 987 F.2d at 320. This is similar to the analysis used currently in bankruptcy cases in the Fifth Circuit. *See In re Cahill*, 428 F.3d 536 (5th Cir. 2005). A court is to use the lodestar method, then may adjust the lodestar up or down based on the factors contained in § 330 and the *Johnson* factors. *See Id.* 428 F.3d at 539-40; *see also In re Fender,* 12 F.3d 480 at 487.

### How Did We Get to the Argument in Pro-Snax?

Prior to the amendments made to § 330(a) in 1994, there was an explicit inclusion in that section that stated that professional fee awards may be made from the bankruptcy estate to a "debtor's attorney." 11 U.S.C. § 330(a). However, there was a split in the case law on the issue of whether a debtor's attorney could be compensated for services rendered after the appointment of a Chapter 11 trustee. *Compare In re NRG Resources, Inc.,* 64 B.R. 643, 647 (W.D. La. 1986) (explaining that "just as a trustee replaces the debtor-in-possession . . . so it is that the trustee's attorney displaces the debtor's attorney"); *with In re Ginji Corp.,* 117 B.R. 983 (Bankr. D. Nev. 1990) ("in light of the provisions of 11 U.S.C. § 330 which permit compensation to a debtor's attorney, the Court believes that the correct approach is not to disallow fees but to scrupulously

inquire into such services so as to ascertain whether or not they were for the benefit of the estate or for some other interest").

This split was discussed by the Bankruptcy Appellant Panel for the Ninth Circuit in *In re Xebec*, 147 B.R. 518 (9th Cir. BAP 1992). In *Xebec,* the panel held that a debtor's attorney can receive compensation for services rendered after a trustee has been appointed only if the debtor's attorney can demonstrate that the services have provided "identifiable, tangible and material benefit to the estate," adopting what is called the "benefit analysis" approach. *See Xebec* 147 B.R. at 523. The panel stated that "[t]he benefit analysis is consistent with the provisions found in the Bankruptcy Act of 1898:

> Under the Act, in order for the debtor's attorney to be entitled to an award of compensation from the estate, the services were required to be rendered in aid of the administration of the estate. . . . The weight of authority under the Act was in favor of limiting compensability to services rendered in assisting debtors in performing their legal duties rather than exercising their legal privileges.

2 Lawrence P. King, *Collier on Bankruptcy,* ¶ 330.04[3] at 330-28 to -30 (15th ed. 1992); *see also, In re Marker,* 100 B.R. 569, 570-571 (Bankr. N.D. Ala.1989)." *Id*. The panel in *Xebec* suggested the following considerations for assessing the benefit to the estate: "(1) whether the debtor's attorney's actions duplicated the duties of the trustee or the trustee's counsel under 11 U.S.C. § 1106; (2) whether the services have in fact, obstructed or impeded the administration of the estate; and (3) whether the debtor attorney's actions are consistent with the debtor's duties under 11 U.S.C. § 521." *Id*. (citations omitted). This was not the position taken by the court in *NRG Resources*, which held that the "'debtor's attorneys' can serve no beneficial purpose for the estate *unless* they are characterized as attorneys for the trustee." *NRG Resources*, 64 B.R. at 647 (emphasis in original).

The "benefits analysis" approach was followed by the court in *In re Melp, Ltd.*, 179 B.R. 636 (E.D. Mo. 1995), which held that "when an operating trustee has been appointed, an additional threshold requirement applies beyond those listed in § 330(a). A debtor's attorney may recover fees despite the appointment of an operating trustee only if his or her services provided an 'identifiable, tangible, and material benefit to the estate.'" *In re Melp, Ltd.*, 179 B.R. 636, 640 (E.D. Mo. 1995)(quoting *Xebec,* 147 B.R. at 523).

### The Bankruptcy Reform Act of 1994

Subsequently, Congress passed the Bankruptcy Reform Act of 1994 ("Reform Act"). The Reform Act renumbered various provisions and substituted the following relevant provisions in section 330:

> (a)(1) After notice to the parties in interest and the United States trustee and a hearing. . . the court may award to a trustee, an examiner, a professional person under section 327 or 1103–
> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and
> (B) reimbursement for actual, necessary expenses.
> (a)(3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including-
> ***
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> ***
> (a)(4)(A) Except as provided in subparagraph (B), the court shall not allow compensation for-
>   (I) unnecessary duplication of services; or
>   (ii) services that were not-
>         (I) reasonably likely to benefit the debtor's estate; or
>         (II) necessary to the administration of the case.
> (a)(4)(B) In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing

the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

11 U.S.C. § 330(a) (1994).

Because the Reform Act removed the phrase "debtor's attorney" from what is now section 330(a)(1) and added subsection (a)(4)(B), which expressly authorizes awards of reasonable compensation to debtor's attorneys only in Chapter 12 and 13 cases, the Fourth, Fifth and Eleventh Circuits held that section 330(a), as amended, was unambiguous and precludes the award of administrative fees to counsel for Chapter 7 or 11 debtors. *See In re Equipment Services, Inc.,* 290 F.3d 739, 742 (4th Cir. 2002); *In re Inglesby, Falligant, Horne, Courington & Nash, P.C. v. Moore (In re American Steel Product, Inc.),* 197 F.3d 1354, 1356-57 (11th Cir.1999); *Andrews & Kurth L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.),* 157 F.3d 414, 425 (5th Cir.1998). The Second, Third and Ninth circuits held that the removal of the words "debtor's attorney" from the statute was a scrivener's error, and a Debtor's attorney could still be compensated after the appointment of a trustee in a Chapter 11 case. *See In re Top Grade Sausage, Inc.,* 227 F.3d 123 (3d Cir. 2000); *In re Century Cleaning Services, Inc.,* 195 F.3d 1053 (9th Cir.1999); *In re Ames Dept. Stores, Inc.,* 76 F.3d 66 (2d Cir. 1996).

**B.     The Fifth Circuit's Decision In Pro-Snax**

### *What Was the Issue on Appeal?*

In *Pro-Snax,* the Fifth Circuit court was presented with the question of "whether a Chapter 11 debtor's attorney may be compensated for work done after the appointment of a trustee under § 330(a) of the Bankruptcy Code." *Pro-Snax,* 157 F.3d at 416. An involuntary Chapter 7 was filed against the debtor on August 10, 1995, and an interim Chapter 7 trustee was appointed on August

31, 1995. From the earliest stages of the bankruptcy proceeding, it was obvious that the case would present "a constant litigation background" because mutual suspicions between the Debtor and the petitioning creditors would prohibit any meaningful negotiations between them. On September 13, 1995, the debtor consented to relief and converted the case to Chapter 11. Prior to the involuntary petition and through the conversion to Chapter 11, the debtor's counsel, Andrews & Kurth, LLP ("A&K"), had provided legal services to the debtor. On October 16, 1995, the bankruptcy court denied the petitioning creditors' motion to reconvert the proceeding to Chapter 7 and appointed a Chapter 11 trustee to oversee the case. Concurrently, the debtor filed a plan of reorganization and disclosure statement. Confirmation hearings on the proposed plan were conducted on February 13, 1996. The Court denied confirmation, and on February 20, 1996, it converted the case to Chapter 7 on motion of the petitioning creditors.

Employment of A&K as counsel for the debtor was authorized by the bankruptcy court *nunc pro tunc* on July 1, 1996, the date on which A&K filed its Application for Compensation and Reimbursement for the period September 13, 1995 (the date of conversion to Chapter 11) through May 31, 1996 (some three months *after* conversion to Chapter 7 and some seven months after the appointment of the Chapter 11 trustee). The creditors objected to the fees requested by A&K arguing that § 330 does not allow compensation to debtor's counsel after the appointment of a Chapter 11 trustee. After a hearing on the application, the bankruptcy court awarded reduced fees.

On appeal the district court reversed, finding that while the American Rule applies in bankruptcy proceedings, 11 U.S.C. § 503 creates an exception to this rule (that each party pays its own attorneys fees) for compensation awarded under § 330(a). *See In re Pro-Snax Distributors, Inc.*, 212 B.R. 834, 836-37 (N.D. Tex. 1997). The district court found that the fees awarded to A&K

for the period after the appointment of a trustee were "contrary to the plain language of § 330(a) in its current version and [the bankruptcy court] must find support, if at all, in the concept that Congress did not mean what it said in the 1994 amendments to the Bankruptcy Code or, alternatively, that the bankruptcy court has inherent authority to make exceptions to the American Rule. *Id*. 212 B.R. at 838. The district court then remanded the case back to the bankruptcy court to determine the amount of fees incurred prior to the appointment of the trustee.

Thus the argument before the Fifth Circuit, on appeal from the decision of the district court, was whether counsel for a Chapter 11 debtor was entitled to compensation for services rendered after the appointment of the Chapter 11 trustee. The Fifth Circuit court analyzed  the construction of 11 U.S.C. § 330, and found that debtors' attorneys are not included as officers of the court who may be compensated. *See In re Pro-Snax*, 157 F.3d at 425. The issue was "whether the bankruptcy court may award fees and expenses to an attorney 'employed under section 327 or 1103,' even though the statute does not include attorneys in its list of officers who may be compensated." *In re Pro-Snax,* at 421. The court stated:

> We decide the issue before us bound by our conventions of statutory construction, even though common sense might lead the lay observer to conclude that a different result is perhaps more appropriate. The law, and the rules to which we adhere in order to interpret it, does not always conform to the dictates of common sense. In this case, we are faced with a statute which is clear on its face. It excludes attorneys from its catalog of professional officers of a bankruptcy estate who may be compensated for their work after the appointment of a Chapter 11 trustee. Although the legislative history and, indeed, a brief syntactical evaluation of the clause at issue suggest that Congress inadvertently neglected to include attorneys, our canons of construction do not require-nay, do not permit-us to consider these exogenous sources when the statute is clear textually on its face. Consequently, we must affirm the judgment of the district court denying compensation to Appellant.

*Id*. at 425.

This position was later affirmed by the Supreme Court in *Lamie v. U.S. Trustee*, 540 U.S. 526, 124 S.Ct. 1023, (2004). The Supreme Court granted a petition for certiorari in the *Equipment Services* case, 538 U.S. 905, 123 S.Ct. 1480, 155 L.Ed.2d 223 (2003), to resolve the circuit split. The Supreme Court stated the argument for the courts that found the language of the statute ambiguous as follows:

> The 1994 enactment's principal, substantive alteration was its deletion of the five words at the end of what was § 330(a) and is now § 330(a)(1): "or to the debtor's attorney." The deletion created an apparent legislative drafting error. It left current § 330(a)(1) with a missing "or" that infects its grammar (*i.e.,* "an examiner, [or] a professional person ..."). Furthermore, the Act's inclusion of the word "attorney" in § 330(a)(1)(A) defeats the neat parallelism that otherwise marks the relationship between §§ 330(a)(1) and 330(a)(1)(A) (*i.e.,* in § 330(a)(1): "trustee, ... examiner, [or] professional person"; in § 330(a)(1)(A): "trustee, examiner, professional person, or attorney") and so casts some doubt on the proper presence of "attorney." That the pre-1994 text had no grammatical error and was parallel in its structure strengthens the sense that error exists in the new text.

*Lamie v. U.S. Trustee*, 540 U.S. 526, 530-531, 124 S.Ct. 1023, 1028 (2004). However, the Supreme Court found that:

> The statute is awkward, and even ungrammatical; but that does not make it ambiguous on the point at issue. In its first part, the statute authorizes an award of compensation to one of three types of persons: trustees, examiners, and § 327 professional persons. A debtor's attorney not engaged as provided by § 327 is simply not included within the class of persons eligible for compensation. In subsection (A) the statute further defines what type of compensation may be awarded: compensation that is reasonable; and for actual, necessary services; and rendered by four types of persons (the same three plus attorneys). Unless the applicant for compensation is in one of the named classes of persons in the first part, the kind of service rendered is irrelevant. The missing conjunction "or" does not change our conclusion. . . . The sentence may be awkward; yet it is straightforward.

*Id.*, 540 U.S. at 534-535, 124 S.Ct. at 1030-31.

### So What Does this Have to Do with the Present Case and
### How Does the Decision in Pro-Snax Affect Whether H&l Gets Paid?

In *Pro-Snax*, the petitioning creditors raised a second argument to the Fifth Circuit court– that A&K should not be compensated for any of its time in the case because the fee award to A&K for the period prior to the appointment of the Chapter 11 Trustee should be governed by the "benefit analysis" approach. As discussed above, this approach was used by courts outside of the Fifth Circuit prior tho the 1994 amendments[1] for awarding fees to a debtor's attorney after the appointment of a trustee only upon showing an "identifiable, tangible and material benefit to the estate." Perhaps because under the facts of the case before it, the court determined that by converting the case to Chapter 11 and proposing an unconfirmable plan, all-the-while knowing that the petitioning creditors, who controlled the majority of the unsecured debt, were moving for the appointment of a trustee, that A&K assumed the risk and should be judged under a standard adopted in other circuits when a trustee had been appointed and a debtor was no longer operating on behalf of the estate, but in its interests alone. In *dictum*, the Fifth Circuit stated that the "benefits analysis" approach should be the standard upon which any award to A&K was made. *Pro-Snax*, 157 F.3d at 426 (citing *In re Melp, Ltd.,* 179 B.R. 636 (E.D. Mo. 1995).

In reaching this conclusion, the Fifth Circuit court relied on *In re Melp*. The district court in *In re Melp*, followed the Bankruptcy Appellant Panel for the Ninth Circuit's holding in *In re Xebec* in using this approach; however, as pointed out subsequently by the Ninth Circuit in *In re Smith*, *Xebec* interpreted the version of section 330(a) in effect prior to amendments by the 1994 Reform

---

[1]The *Pro-Snax* case was filed after the effective date of the amendments made to § 330(a) by the Bankruptcy Reform Act of 1994.

Act. *In re Smith*, 317 F.3d 918, 925 (9th Cir. 2002). As the Ninth Circuit later pointed out, it is now the amendments to section 330(a) and not *Xebec* that govern whether a bankruptcy court may award compensation. *Id*. ("[S]ection 330(a)(4)(A) provides clarification by requiring only that the services rendered be 'reasonably likely to benefit to the debtor's estate,' 11 U.S.C. § 330(a)(4)(A)(ii)(I) (1994), and does not require that the services actually provide an 'identifiable, tangible and material benefit to the [debtor's] estate'. . . Because section 330(a) provides the legal standard for evaluating all compensation awards to bankruptcy attorneys, to the extent that *Xebec* may be inconsistent with section 330(a)(4)(A), *Xebec* has been superseded and is overruled."). In a later decision, the Fifth Circuit has also pointed to § 330(a)(1)-(6) as the proper standard. *See In re Cahill,* 428 F.3d at 539-40.

Later in its opinion, the court went on to state that "any work performed by legal counsel on behalf of a debtor must be of material benefit to the estate." *Pro-Snax*, 157 F.3d at 426. This is where the *Pro-Snax* decision has created issues among the lower courts. Courts in this circuit have used this statement in *Pro-Snax* along with the instruction that A&K's services must "*result in* an identifiable, tangible and material benefit to the estate," *Pro-Snax*, 157 F.3d at 426 (emphasis added), and stated that the court must make this analysis in hindsight. *See, e.g., In re Weaver*, 336 B.R. 115, 119 (Bankr.W.D. Tex. 2005); *In re Quisenberry*, 295 B.R. 855, 865 (Bankr. N.D. Tex. 2003); *In re Needham*, 279 B.R. 519, 521 (Bankr. W.D . La. 2001). While, as indicated by the Fifth Circuit in *Pro-Snax*, a court must look to the benefit to the estate in determining whether professional fees are reasonable (*see* 11 U.S.C. § 330(a)(3)(C)), under the express language of the statute, the analysis is made "at the time at which the service was rendered" and not in hindsight. In determining the amount of reasonable compensation to be awarded, section 330(a)(3) instructs the court to take into

account "all relevant factors," including the lodestar calculation, "whether the services were necessary to the administration of, or beneficial *at the time at which the service was rendered* toward the completion of the case," whether the services were performed timely, and whether the compensation requested is based on rates customarily charged by other similarly skilled practitioners. 11 U.S.C. § 330(a)(3) (emphasis added). Furthermore, the Bankruptcy Code does not allow a court to award compensation for "services that *were not reasonably likely to benefit the debtor's estate*." 11 U.S.C. § 330(a)(4)(A) (emphasis added). The Code does not say "services that did not benefit the debtor's estate," but rather instructs a court to look at the benefit of the services at the time they were rendered.

As the Supreme Court has instructed in the *Lamie* decision, "[i]t is well established that 'when the statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms.' " *Lamie v. United States Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 1030 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)). The Fifth Circuit has followed this standard as well. *See Gaddis v. United States*, 381 F.3d 444, 472 (5th Cir. 2004). This Court finds that, based on the wording in § 330(a)(3) and (4), professional fees are not to be judged in hindsight.

### C. Application to the Present Case

As stated above, the Fifth Circuit uses the lodestar method, § 330 of the Bankruptcy Code, and the *Johnson* factors to determine reasonableness of attorney fees in a bankruptcy case. *See In re Cahill*, 428 F.3d 536, 539 (5th Cir. 2005). Furthermore, a court has broad discretion in determining the amount in awarding attorney's fees. *Id*.

In the present case, the work of H&L on the rights offering and plan were reasonable services rendered at the time. At the time such work was performed, the case appeared to be headed to a consensual confirmation. The facts changed in early December 2004. On December 13, 2004, the Creditors' Committee also objected to the plan proposed by H&L. The company's affairs had collapsed and the Debtor had defaulted in its DIP facility. On December 14, 2004, counsel for the Equity Committee wrote to counsel for the Debtor noting defaults under the Investment Agreement, including the failure to file the S-1 statement and the fact that the Debtor would have to restate its financials. At this point in time the services rendered by H&L were no longer beneficial or necessary to the administration of the estate at the time they were rendered, and largely consisted of efforts on behalf of the Equity Committee to try to resuscitate the failed plan. Shortly thereafter, H&L ceased its work and the Equity Committee disbanded.

The Court has entered a separate order denying H&L's fees incurred after December 13, 2004. At this point H&L was given fair notice that its efforts to pull this case out of bankruptcy through a rights offering were futile. Prior to this H&L's fees were reasonable and necessary, based the time spent and the rates charged by H&L for the work performed. This work was beneficial to the estate at the time the work was performed, and based on its complexity, was performed timely and at the rates customarily charged by comparably skilled practitioners.

**D.  Alternatively, H&L's Status as Committee Counsel
Compels a Different Result than Pro-Snax**

This Court realizes that its understanding of the *Pro-Snax* decision may be misplaced.

Certainly, other courts in Texas have construed the decision as requiring a hindsight analysis for

professionals.  *See, e.g., In re Weaver*, 336 B.R. 115, 119 (Bankr.W.D. Tex. 2005); *In re*

*Quisenberry*, 295 B.R. 855, 865 (Bankr. N.D. Tex. 2003).  Nevertheless, the *Pro-Snax* opinion is

directed at a debtor's professionals, for obvious reasons–usually they have more control over the

reorganization efforts and strategy in a bankruptcy case.  At least in *Pro-Snax* they controlled the

conversion to Chapter 11 and the failed plan process.

H&L also makes the argument that the stricter "hindsight" standard urged by the

Liquidating Trustee for assessing the reasonableness of H&L's fees does not apply to committee

counsel, because the *Pro-Snax* decision only addressed attorney's fees awarded to counsel for a

debtor in a bankruptcy case.

Official Committees appointed under § 1102 of the Bankruptcy Code are given broad

authority under § 1103(c) to formulate a plan for reorganization and to perform "such other

services as are in the interest of those represented."  Within this broad grant of authority is an

implied "fiduciary duty to the committee's constituents."  *In re Mesta Mach. Co.*, 67 B.R. 151,

156 (Bankr. W.D. Pa. 1986).  The fiduciary duty of counsel to a committee "extends to the class

as a whole, not to its individual members."  *In re Drexel Burnham Lambert Group, Inc.*, 138

B.R. 717, 722 (Bankr. S.D.N.Y. 1992); *see also Matter of Levy*, 54 B.R. 805, 807 (Bankr.

S.D.N.Y. 1985) (ruling that counsel for the committee do not represent any individual creditor's

interest in a case since they were retained to represent the entire class, and thus, do not owe a

duty to one creditor to maximize its interest).

Further, while counsel to a committee must act in accordance with provisions of the

Bankruptcy Code, with respect to the bankruptcy court, it works for and holds only a fiduciary

duty to those whom it represents, not for the debtor or the estate generally. *See In re PWS*

*Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *see also, In re SPM Mfg. Corp.*, 984 F.2d 1305,

1316-17 (1st Cir. 1993). Making committee counsel responsible to constituencies outside the

committee itself, would lead to confusion for the professionals and absurd results in the

bankruptcy case. *Cf. ICM Notes, Ltd. v. Andrews & Kurth, L.L.P.,* 278 B.R. 117, 124 (S.D. Tex.

2002), *affd.* 324 F.3d 768 (5th Cir. 2003) ("the confusion wrought by this undefined duty [of

debtor's counsel to the debtor and all creditors of the estate] and its intended obligee outweighs

its utility"). Similarly, "[c]ounsel to a debtor in possession cannot be expected to perform

functions inconsistent with the debtor's fiduciary duties." *In re Phoenix Group Corp.*, 305 B.R.

447, 452 (Bankr. N.D. Tex. 2003).

Often times, the interests of equity holders, creditors, and the debtor diverge. *ICM Notes,*

*Ltd. v. Andrews & Kurth, L.L.P.,* 278 B.R. 117, 126 (S.D. Tex. 2002), *affd.* 324 F.3d 768 (5th Cir.

2003) ("in a bankruptcy proceeding, the debtor, secured creditors, unsecured creditors, and other

related parties have different and competing interests"). The Equity Committee retained H&L as

counsel and all efforts by H&L were in the best interest of its constituents, the Equity Committee.

H&L, pursuant to § 1103(c), was fulfilling its fiduciary obligation to the Equity Committee in its

efforts to formulate a plan of reorganization, filing of disclosure statements and formulation of

the rights offering to preserve something for equity holders. Thus, as counsel to the Equity

Committee, H&L should not be judged by the resulting benefit to the estate, but only as to the

benefit conferred in the best interests of the committee. *Cf. In re Texasoil Enterprises, Inc.*, 296

B.R. 431, 436 (Bankr. N.D. Tex. 2003) ("success or failure of a reorganization case is only a fair measure of the value and competence of counsel if counsel can be charged with responsibility for the cause of the case's outcome").

Not always will the work by counsel for a committee be compensable. The reasonableness standard of § 330 will always allow a court to reduce fees in an appropriate case. Indeed, in the present case, the Court disallowed fees for H&L after December 13, 2004, when it was clear that equity was "out of the money."

For these additional reasons, the Fifth Circuit *dictum* in *Pro-Snax* does not preclude an award to H&L.

## E.    CONCLUSION

As the Supreme Court has counseled in the *Lamie* opinion, this Court is charged to construe 11 U.S.C. § 330(a)(3)-(4) as written. *Lamie*, 540 U.S. at 534, 124 S.Ct. at 1030. This Court believes that a careful reading of the Fifth Circuit's opinion in *Pro-Snax* does not compel a different result. In any event, the "benefits analysis" of *Pro-Snax* is directed to professionals for the debtor who knew that their efforts were futile, and therefore any time incurred by them was unreasonable at the time the fees were incurred. H&L, as counsel to the Equity Committee, had fiduciary duties to its constituents, which it clearly fulfilled. At the time such services were rendered, they were reasonable.

Under separate order, this Court has allowed the fees and expenses of H&L through December 13, 2004, the date it became clear that the Equity Committee's plan would not be confirmed.

###End of Memorandum Opinion###